1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANKIE LON HICKS,

             Petitioner,

   v.

JIM ROBERTSON,

             Respondent.

No.  1:21-cv-01276-AWI-SKO (HC)

**FINDINGS AND RECOMMENDATION
TO DENY PETITION FOR WRIT OF
HABEAS CORPUS**

**[THIRTY DAY OBJECTION DEADLINE]**

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is currently in state prison serving a sentence of life without parole plus 25 years-to-life pursuant to a judgment of the Merced County Superior Court.  The habeas petition presents five claims challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On November 12, 2015, a Merced County jury found Petitioner guilty of one count of first degree murder (Cal. Penal Code § 187(a)), and one count of intentionally and maliciously killing an animal (Cal. Penal Code § 597(a)).  (Doc. 16-16 at 144-147.[1])  The jury found true the special circumstance allegations that Petitioner committed the offense during a residential burglary (Cal. Penal Code § 190.2(a)(17)(G)), and by means of lying in wait (Cal. Penal Code § 190.2(a)(15)).

---

[1] Unless otherwise noted, references are to ECF pagination.

(Doc. 16-16 at 92-93.)  The jury also found true the enhancement that Petitioner personally and intentionally discharged a firearm and proximately caused death (Cal. Penal Code § 12022.53(d)). (Doc. 16-16 at 93.)  On January 8, 2016, the trial court sentenced Petitioner to a term of life without the possibility of parole on the murder count and a consecutive term of 25 years-to-life on the firearm use enhancement.  (Doc. 16-16 at 146.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On January 24, 2019, the Fifth DCA affirmed the judgment but remanded the matter to the trial court to exercise discretion on the sentence based on a recent retroactive, ameliorative amendment to the firearm enhancement statute.  (Doc. 16-1.)  On February 15, 2019, the Fifth DCA denied Petitioner's request for rehearing. (Doc. 16-9.)  Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on May 15, 2019. (Doc. 16-11.)  On remand, the Merced County Superior Court reimposed the original sentence. (Doc. 16-12.)  Petitioner did not seek further appellate review or collateral action.

On August 23, 2021, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on December 14, 2021. (Doc. 15.)  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND

The facts are derived from the appellate court's Statement of Facts in its unpublished decision[2]:

### A.    Prosecution's Case in Chief

#### 1.    Murder of Casey Desalles

Casey Desalles lived in the main house on a 20-acre ranch in Stevinson. A number of trailers were also located on the property. Desalles's friend, Anthony Davison, lived in one of the trailers. Davison's trailer did not have a bathroom so Davison used the bathroom in Desalles's house, the front door to which was usually unlocked. Desalles used another trailer on his property

---

[2] The Fifth DCA's summary of facts in its unpublished opinion in People v. Hicks, 2019 WL 311916, at *1–5 (Cal. Ct. App. 2019) is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

for growing marijuana, which he also sold. The trailer used for growing marijuana was padlocked on the outside.

On February 25, 2014, Davison had watched TV with Desalles at the latter's house until about 10:30 p.m. The next morning, February 26, 2014, Davison woke up around 5 a.m. and went, as usual, to use the bathroom in Desalles house. Inside the house, he found a shirtless Desalles lying on the floor. Desalles was cold to the touch, had some small holes in his side, and "there was a hatchet in his head." Davison immediately called 911.

Merced County Sheriff's deputies arrived at the house shortly. They located Desalles's dead body and also discovered that his dog was dead. A large safe in the bedroom was open and several guns were leaning against the bed. Adjacent to the house was a trailer containing marijuana plants; the trailer was secured with a padlock on the outside.

The deputies inspected the room in which Desalles's body was lying. The body was in a room with a bar, referred to during the trial as the barroom. The back door to the barroom was made of glass; the glass was broken and a small radio was lying on the floor just inside the door. The deputies found pieces of paper lying on and around Desalles's body. In addition, the deputies collected seven .22-caliber cartridge casings; another two casings were recovered the next day. Subsequent testing confirmed all the cartridge casings were fired from the same gun. A cell phone was also recovered from the house. Deputies learned that the hatchet found in Desalles's head had been kept in the barroom for purposes of chopping firewood stacked outside the back door.

### 2.     Arrests of Emilio Virgen and Petitioner

On March 11, 2014, Merced County Sheriff's Detective Erick Macias received an anonymous tip to the effect that a Royce Hollister had information about the murder; the tipster also referred to an Emilio Virgen and a Frankie Lon Hicks (Petitioner) and mentioned that a homemade silencer made of a plastic bottle and pieces of paper was used in the murder. Macias and Detective Mike Ruiz contacted Hollister on March 26, 2014. Hollister referred the detectives to Emilio Virgen. Macias and Ruiz interrogated Virgen the following day. Virgen was initially evasive. However, after he was made aware of the detectives' contacts with Hollister, Virgen revealed that, on the night in question, he went with Petitioner to Desalles's property, to steal

marijuana; Petitioner went into the house and killed Desalles, while Virgen waited in the car. Virgen was arrested. Later that night, Detective Ruiz arrested Petitioner and transported him to the sheriff's department for interrogation; sheriff's deputies also searched Petitioner's house.

### 3.    Petitioner's Police Interrogation

Detectives Macias and Ruiz interrogated Petitioner at the sheriff's department. Petitioner admitted he killed Desalles as part of an attempt to steal the marijuana the latter grew in the trailer behind his house. Petitioner told detectives he knew, from "word of mouth," that Desalles "harvest[ed] hundreds of pounds [of marijuana] every year." Petitioner believed that, at the time of the murder, Desalles had a "[s]hitload of weed," "about a hundred pounds," in the trailer. Petitioner and Virgen talked for months about stealing Desalles's trove of marijuana. Petitioner even had "a buyer for the pot." Two days before the murder, Petitioner scouted out Desalles's property. He sneaked into Desalles's house while the latter slept, to look for the key to the marijuana trailer's padlock but did not find it.

On the night of the murder, Petitioner and Virgen left Petitioner's house in Petitioner's white Honda. Petitioner had a .22-caliber semi-automatic rifle and a .12-gauge shotgun, both of which he loaded during a stop in an orchard on the way to Desalles's ranch. At the end of the barrel of the .22, he fitted a homemade silencer—one he had made by filling an empty apple juice bottle with strips of paper that had been duct-taped together. He also brought along a piece of pipe in case the gun failed to work. Petitioner wore a ski mask; both Petitioner and Virgen wore gloves and stuck duct tape on the bottoms of their shoes. Petitioner eventually parked on a road behind Desalles's house and approached the house, through "empty fields," on foot. Virgen stayed in the car. They communicated via walkie-talkies.

At approximately 2:00 a.m., Petitioner crept into Desalles's house through an unlatched glass backdoor leading to the barroom. He hid behind the bar. Desalles was watching TV in another room. Petitioner made various "noises" to lure Desalles into the barroom, so as to bring him out of his "safety zone" and into Petitioner's "kill zone." The idea was to "ambush" Desalles. Finally, Petitioner threw a transistor radio "type-thing" towards the back door, breaking part of the glass backdoor. Desalles came into the room, whereupon Petitioner shot him eight times with

the .22-caliber rifle. Petitioner noted that he shot Desalles "[a]s soon as [he] saw [Desalles]" enter the room. Desalles's dog was barking, so Petitioner "took out" the dog, by hitting it "in the back of the head with a hatchet" he found in the room. Meanwhile, Desalles continued to roll about "more than what [Petitioner had] ever seen any other dead body do," indicating ongoing "brain activity." Petitioner then shot Desalles a few more times and hit him a few times with the hatchet as well. Petitioner switched to the hatchet because his homemade silencer would likely have stopped working by then. He explained that his "method of silencing the gun is limited to a certain amount of shots," after which the "bottle starts cracking" and cannot "hold the pressure."

Petitioner quickly looked around the house for other people and then began searching for the key to the padlock on the marijuana trailer. He had brought a bolt cutter with him but did not want to use it because of the noise it would make. He "went through" an open safe, setting aside the guns that were in it. However, he did not find the padlock key. Petitioner then told Virgen to come to the house, so as to deploy another set of hands and eyes in the search for the padlock key. Petitioner saw a text message on Desalles's phone indicating that someone was coming over to the house. He and Virgen went to the marijuana trailer to try to cut off the padlock with the bolt cutter, but the bolt cutter broke at "the hinge." Since they were nervous that someone was heading to the house, they decided to leave. All they took from the house was a duffle bag with some "crappy ass weed."

Petitioner and Virgen drove straight to the Delta-Mendota Canal near Crows Landing. Petitioner threw the .22-caliber rifle, the walkie-talkies, the ski mask, and various articles of clothing into the canal. He burned the duffel bag on the canal bank.

Petitioner said he felt bad about killing the dog but not Desalles, who was a "piece of shit" and a "tweak." Petitioner said he had killed other people as well. He described himself as a "fucking sociopath" and said that killing was "better was sex." He said he had fantasized about killing someone since he was about five years old and needed to be "put away." However, Petitioner was worried about any consequences for Virgen. Although Petitioner acknowledged that Virgen was aware, based on their discussions in planning the crime, of the possibility that Desalles would be killed, Petitioner emphasized that Virgen would not have expected that

5

actually to occur. Petitioner said he wished he had told his parents about his sociopathy.

### 4.      Physical Evidence

Petitioner led sheriff's detectives to the part of the canal where he had dumped the gun and other items after Desalles's murder. The detectives found .22-caliber shell casings and a duffel bag with containers of a green, leafy substance along the canal bank. Subsequently, law enforcement divers recovered from the canal a Remington .22-caliber rifle with a homemade silencer attached to the end of the barrel, two silver .22-caliber magazines that were taped together (one of the magazines contained four live bullets), and two walkie-talkies.[3]

As for the prior search of Petitioner's house, it had turned up a .12-gauge shotgun; a duffel bag containing marijuana-filled glass jars; a chrome magazine that was identical to the magazines recovered from the canal; several clear plastic bottles that appeared to have been shot through (one of which was the same type of apple juice bottle as was fitted on the .22-caliber rifle as a silencer); and a paper shredder containing shredded paper.

A search of Desalles's cell phone confirmed that he had received a text indicating that someone was headed to his house, consistent with Petitioner's statement to the police.

A forensic pathologist who conducted the autopsy on Desalles's body testified that the cause of Desalles's death was "[m]ultiple gunshot wounds and chop wounds of the head." There were 10 separate bullet-entry wounds on Desalles's body; nine bullet projectiles were also recovered from the body. One of the bullets appeared to have traveled through Desalles's hand before striking another part of his body, potentially explaining the discrepancy between the number of entry wounds and the number of bullets identified. The left side of Desalles's face had five chop wounds. Nine bullet casings found near Desalles's body were determined to have been fired from the same gun.

### 5.      Virgen's Trial Testimony

Virgen initially faced a murder charge for his role in Desalles's killing but eventually reached a more favorable resolution in exchange for testifying against Petitioner. Specifically, he

---

[3] Detective Macias testified that magazines are taped together to enable fast, "tactical reloading." He explained that when one magazine is emptied, it can be turned over and quickly switched with the second one.

pleaded guilty to first degree burglary, multiple counts of conspiracy to commit second degree burglary, trespassing, and three counts of possession of stolen property. He received a 14-year prison sentence.

Virgen and Petitioner grew up together as friends and neighbors. They knew Desalles grew marijuana and, in the weeks leading up to the murder, made plans to rob him. The plan was for Petitioner to go into the house and gain access to the marijuana trailer. Virgen would join Petitioner when Petitioner was ready for him. The plan was to commit a burglary only.

On the night of the crime, Petitioner gave Virgen gloves, duct tape for the bottoms of his shoes, and a walkie-talkie. Petitioner drove them to the vicinity of Desalles's ranch. Petitioner got out of the car carrying a long gun with a homemade silencer made of a plastic bottle and paper. About 20 minutes later, Petitioner told Virgen, via walkie-talkie, to "come through." Virgen drove the car over to the front of the house and went in. He saw that Desalles and the dog were dead. Virgen was surprised because he "didn't really think it was going to happen." Virgen took a duffle bag of marijuana from the garage. Petitioner told Virgen that a text on Desalles's cell phone indicated that someone was headed to the house. Petitioner and Virgen tried to get into the marijuana trailer outside the house but were foiled by the padlock on it. As they drove home, Petitioner told Virgen he had shot Desalles. Virgen disposed of his shoes and gloves on the side of the road and his jacket in the canal.

A video recording of Virgen's police interrogation was also played for the jury during his trial testimony. During the interrogation, Virgen said that, before the night of the murder, Petitioner had talked about the possibility of hurting or killing Desalles. Virgen had told Petitioner, "'I don't wanna be, you know, the one, you know, I ain't involved with that shit. I ain't no killer,' you know?" Virgen said that Petitioner was crying after shooting Desalles.

B.     Defense Case

1.     Petitioner's Trial Testimony

Petitioner testified on his own behalf. He started using marijuana recreationally as a teenager but stuck with it because it relieved symptoms associated with celiac disease, from which he suffered. Petitioner acknowledged that he knew Desalles was a marijuana grower and

7

dealer and had discussed stealing Desalles's marijuana with Virgen. They believed Desalles would have between 60 and 100 pounds of harvested, dried marijuana.

On the night of the murder, between midnight and 1:00 a.m., Petitioner went to Desalles's house with Virgen. Stevinson, where Desalles's house was situated, was about a 45-minute drive away from Crows Landing. Petitioner took a .22-caliber rifle equipped with a homemade silencer created with an empty plastic bottle filled with pieces of paper. His plan was to enter the house, lure Desalles outside, and then surprise the latter by posing as a sheriff's deputy and asking for the marijuana. Petitioner acknowledged he was not wearing a uniform and, contradicting his police statement, denied wearing a ski mask. Petitioner also testified that his plan went terribly wrong.

On the night in question, Petitioner entered Desalles's house and hid in the barroom. He tried making various noises to get Desalles to go outside. Instead, Desalles came into the barroom to investigate and picked up a hatchet from the bar. Petitioner was wedged in behind the bar in a low crouch and was having difficulty moving; he was frozen in position as a result of kneeling for a long time. Desalles walked towards Petitioner, ignoring Petitioner's command to stop and drop the hatchet. Petitioner fired a shot, hoping that Desalles would let him get up and leave. Instead, Desalles raised the hatchet. Gripped by fear, Petitioner shot Desalles. At one point, he switched out the magazine in the rifle and, in "pure panic," kept shooting. Eventually, Desalles fell down. Desalles's dog was barking so Petitioner tried to calm it down; when he could not, he hit it with the hatchet and killed it. Petitioner turned around and saw Desalles reaching for the rifle, which Petitioner had set down. Petitioner then hit Desalles with the hatchet a number of times. At that point, Petitioner told Virgen, over walkie-talkie, to come to the house. Virgen pulled up in the car and ran into the house. Petitioner and Virgen soon fled the house without even attempting to break into the marijuana trailer. They drove to the Delta-Mendota canal by Crows Landing and threw the .22-caliber rifle, various items of clothing, and the walkie-talkies into the water.

Petitioner testified that when he saw the police arrive at his house on the day of his arrest, he ran into his room and swallowed about 18 grams of honey oil, a form of concentrated cannabis. He had never before consumed such a large quantity of honey oil in one go and was "really high" during his subsequent interrogation. As a result, he said outlandish things. Later,

upon viewing the videotape of the interrogation, he was in shock because those statements were not true. Petitioner was also concerned about protecting Virgen at the time of the interrogation, a continuing priority for him. Petitioner felt "terrible" about what he did to Desalles.

C.    Prosecution's Rebuttal

The People called an expert on narcotics in their rebuttal case. The expert testified that a person who ingested 12 to 18 grams of honey oil would be rendered comatose and unable to respond to questioning in a comprehensible manner. The expert acknowledged that honey oil is a "highly hallucinogenic" substance that can cause people to become delusional.

## III.    DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Merced County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State

1  court proceeding."  28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003);

2  <u>Williams</u>, 529 U.S. at 412-413.

3       A state court decision is "contrary to" clearly established federal law "if it applies a rule

4  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

5  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

6  different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-

7  406).

8       In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

9  an "unreasonable application" of federal law is an objective test that turns on "whether it is

10  possible that fairminded jurists could disagree" that the state court decision meets the standards

11  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

12  application of federal law is different from an incorrect application of federal law.'" <u>Cullen v.</u>

13  <u>Pinholster</u>, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

14  court's decision was 'merely wrong' or 'even clear error.'" <u>Shinn v. Kayer</u>, ___ U.S. ___, ___ ,

15  141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting <u>Virginia v. LeBlanc</u>, 582 U. S. ___,

16  ___, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)).  Instead, a state prisoner seeking a writ of habeas

17  corpus from a federal court "must show that the state court's ruling on the claim being presented

18  in federal court was so lacking in justification that there was an error well understood and

19  comprehended in existing law *beyond any possibility of fairminded disagreement*." <u>Richter</u>, 562

20  U.S. at 103 (emphasis added); <u>see also</u> <u>Kayer</u>, 141 S.Ct. at 523, 2020 WL 7327827, *3.  Congress

21  "meant" this standard to be "difficult to meet." <u>Richter</u>, 562 U.S. at 102.

22       The second prong pertains to state court decisions based on factual findings.  <u>Davis v.</u>

23  <u>Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)).

24  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

25  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

26  facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539

27  U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

28  factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

1  among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

2  1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

3      To determine whether habeas relief is available under § 2254(d), the federal court looks to

4  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

5  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

6  2004).  "[A]lthough we independently review the record, we still defer to the state court's

7  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

8      The prejudicial impact of any constitutional error is assessed by asking whether the error

9  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

10  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

11  (holding that the Brecht standard applies whether or not the state court recognized the error and

12  reviewed it for harmlessness).

13      C.    Review of Petition

14      Petitioner raises the following five claims in his petition: 1) The trial court committed

15  structural error by allowing the reporting of jury selection to be waived without a personal waiver

16  from Petitioner in violation of the 14th Amendment; 2) Defense counsel's decision to waive

17  reporting of voir dire constituted ineffective assistance of counsel in violation of the 6th

18  Amendment; 3) Defense counsel failed to seek instruction on heat of passion second degree

19  murder resulting in ineffective assistance in violation of the 6th Amendment; 4) Petitioner

20  suffered cumulative prejudice resulting from the errors asserted in the previous claims; and 5)

21  Petitioner's mandatory sentence of life without possibility of parole for a crime committed when

22  he was 21 years old constituted cruel and unusual punishment in violation of the 8th Amendment.

23          1.    Personal Waiver

24      In his first claim for relief, Petitioner alleges the trial court committed structural error

25  when it permitted the defense to waive reporting of jury selection without first obtaining a

26  personal waiver from Petitioner.  Although defense counsel waived reporting in open court,

27  Petitioner contends that only he, personally, could waive reporting of jury selection.  He alleges

28  that as a result, he was denied a meaningful opportunity for appellate review.

Petitioner raised this claim to the state courts on direct review.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> [Petitioner] argues that the trial court violated his Fourteenth Amendment due process right to "meaningful appellate relief" in permitting defense counsel to waive the reporting of jury voir dire rather than taking a personal, on-the-record waiver from [Petitioner] for this purpose. [Petitioner] further argues the trial court's error was structural. We reject [Petitioner]'s contentions.

> **A. Background**

> Prior to jury voir dire, in the presence of the defendant, the court and counsel discussed various trial stipulations, including a stipulation waiving reporting of the voir dire proceeding. This stipulation provided: "VOIR DIRE REPORTING: The presence of a court reporter is waived for voir dire." The stipulation was signed by the court, defense counsel, and the prosecutor. The following colloquy occurred in connection with the stipulation:

>> "THE COURT: Let's go on the record. This is the matter of the People versus [Petitioner]. [Petitioner] is present accompanied by [defense counsel]. [The prosecutor] is here from the DA's office.

>> We're discussing the Court's standard trial stipulations. It appears the defense is okay with them.... [¶]

>> "[DEFENSE COUNSEL]: Yes, that's true, Your Honor....

>> And in this case I have no problems with ... waiving a reporter for voir dire.

>> "THE COURT: The only time an issue would come up – and I don't expect it. I've not had it come up in my five years on the bench – is Batson-Wheeler issue.

>> "[DEFENSE COUNSEL]: Yeah, that did come to mind, but if nothing else, we would start by going out of the presence of the jury.

>> "THE COURT: Correct, and take the reporter with us.

>> "[DEFENSE COUNSEL]: So that's fine. Yeah, I agree with all of those. I will execute this.

>> "THE COURT: All right. Thank you.

>> So, madam reporter, you needn't report voir dire."

> **B. Analysis**

> "'An appeal from a judgment of conviction is not a matter of absolute right, independently of constitutional or statutory provisions allowing such appeal. A review by an appellate court of the final judgment in a criminal case, however grave the offense of which the accused is convicted, was not at common law, and is not now, a necessary element of due process of law. It is wholly within the discretion of the state to allow or not to allow such a review.... [¶] 'It is therefore clear that the right of appeal may be accorded by the state to the accused upon

12

such terms as in its wisdom may be deemed proper.'" (*In re Walker* (1976) 56 Cal.App.3d 225, 227 (*Walker*), quoting *McKane v. Durston* (1894) 153 U.S. 684, 687-688.) In turn, "California has made the right to appeal a statutory creature whose scope and authority is only as specifically delineated." (*Walker, supra,* at p. 227; *People v. Mazurette* (2001) 24 Cal.4th 789, 792 ["'It is settled that the right of appeal is statutory and that a judgment or order is not appealable unless expressly made so by statute.'"]; *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1659 ["The right to appeal a criminal conviction has no roots in the United States or California Constitutions and is a statutory right only."].) However, "[o]nce appellate review is established it must be kept free from any procedures which violate due process or equal protection of the law." (*Walker, supra,* at p. 227.)

[Petitioner] argues that, by waiving reporting of the jury selection proceeding, his trial counsel effectively waived his right to appeal. Noting that the right to waive an appeal is "one of the rare fundamental rights" which the accused must waive personally, he further contends that "if the defendant must personally make the decision to waive an appeal, he must also personally waive the corresponding right to be furnished with a transcript necessary to that appeal." (See, e.g., *People v. Panizzon* (1996) 13 Cal.4th 68, 80 ["Just as a defendant may affirmatively waive constitutional rights to a jury trial, to confront and cross-examine witnesses, to the privilege against self-incrimination, and to counsel as a consequence of a negotiated plea agreement, so also may a defendant waive the right to appeal as part of the agreement."].)

To the extent [Petitioner] argues that counsel's waiver of the reporting of jury selection proceedings effectively amounted to a waiver of his right to appeal altogether, that argument is unavailing. Counsel only waived reporting of a limited proceeding, i.e., jury selection, while reserving the right to request a reporter at any point in the course of that proceeding. Counsel's limited, qualified waiver of reporting of jury selection cannot be equated to a situation where counsel, on his own, waives the defendant's right to appeal altogether. Even assuming counsel's waiver negatively impacted [Petitioner]'s appeal, there is no authority for the proposition that a personal waiver from the defendant is required with respect to every action by counsel that forecloses an issue on appeal. Furthermore, as discussed below, the terms of the statute governing the reporting of trial court proceedings in non-capital criminal cases supports our conclusion that counsel's waiver was valid and proper.

California statutes not only provide for the right to appeal but further provide for the reporting of trial court proceedings, so as to "allow access by an appealing defendant in a criminal case to '"a record of sufficient completeness"' to permit proper consideration' of his appeal." (*In re Armstrong* (1981) 126 Cal.App.3d 565 (*Armstrong*).) Thus, section 190.9 provides for the reporting of trial court proceedings in capital cases. Section 190.9, subdivision (a)(1) states: "In any case in which a death sentence may be imposed, all proceedings conducted in the superior court, including all conferences and proceedings, whether in open court, in conference in the courtroom, or in chambers, shall be conducted on the record with a court reporter present." As for non-capital cases, Code of Civil Procedure section 269, subdivision (a)(2) (CCP 269(a)(2) ), provides for the reporting of proceedings in non-capital felony cases, which reporting occurs at state expense. (See Gov. Code, § 69952.) Code of Civil Procedure section 269 provides:

> "(a) An official reporter or official reporter pro tempore of the superior court shall take down in shorthand all testimony, objections made, rulings of the court, exceptions taken, arraignments, pleas, sentences, arguments of

the attorneys to the jury, and statements and remarks made and oral instructions given by the judge or other judicial officer, in the following cases: [¶] ... [¶]

"(2) In a felony case, on the order of the court or at *the request* of the prosecution, the defendant, or the attorney for the defendant." (Italics added.)

Under CCP 269(a)(2), in a felony case, a defendant, either personally or through his counsel, may *request* transcription of trial court proceedings, including objections made, rulings of the court, and statements and remarks made and oral instructions given by the judge, or the trial court may order it. (See, e.g., *People v. Goudeau* (1970) 8 Cal.App.3d 275, 279-280 ["In California felony proceedings a court reporter must be present *if requested* by the defendant, the district attorney, or on order of the court. (Code Civ. Proc., § 269.)" (Italics added.)]; *People v. Manson* (1976) 61 Cal.App.3d 102, 214 [CCP 269(a)(2) provides for the reporting of trial court proceedings upon request].) The purview of CCP 269(a)(2) encompasses jury selection proceedings, since counsel makes objections, and the trial court makes statements, remarks, and rulings and gives instructions, during such proceedings. (See *Darcy v. Moore* (1942) 49 Cal.App.2d 694, 699 [CCP 269(a)(2) encompasses jury selection proceedings].) In *Armstrong, supra*, 126 Cal.App.3d 565, the Court of Appeal extended the right to request transcription granted to felony defendants by CCP 269(a)(2), to misdemeanor defendants as well. *Armstrong* held that, the right to appeal necessitates the provision of a mechanism ensuring adequate appellate review, whereby the "state shall provide, *upon the defendant's request*, some method of recording verbatim, the testimony and other oral proceedings of a *felony or misdemeanor* criminal action." (*Armstrong, supra*, at p. 573 (italics added).)

[Petitioner]'s argument that the trial court was required to obtain a personal, on-the-record waiver of his right to reporting of the jury selection proceeding is foreclosed by CCP 269(a)(2) itself, which expressly states that reporting of trial court proceedings in a non-capital felony case is available upon order of the court or the *request* of the defendant, defense counsel, or the prosecutor. CCP 269(a)(2) thus protects a defendant appearing in propria persona by extending to him the right to request the reporting of trial court proceedings and further, also permits a defendant's attorney to request the reporting of proceedings on the defendant's behalf. [Fn.3] Since CCP 269(a)(2) extends the right *to request* reporting of proceedings to both a defendant and counsel, it follows that both may also forfeit or waive this right on the defendant's behalf. Here, [Petitioner], who was represented by counsel, did not request reporting of the jury selection proceeding, thereby forfeiting his right to do so. Furthermore, defense counsel expressly and affirmatively waived in open court, in [Petitioner]'s presence, reporting of the jury selection proceeding and subsequently executed a written stipulation to this effect. (*People v. Turner* (1998) 67 Cal.App.4th 1258, 1264 (*Turner*) [under CCP 269, non-capital defendants have only a "statutory right to have the proceedings recorded and prepared by a certified shorthand reporter, which right can be waived" by the defendant or his attorney]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1333, fn. 70 [in criminal matters, parties may waive right to have certain proceedings reported], overruled on other grounds by *People v. Merritt* (2017) 2 Cal.5th 819; *People v. Rogers* (2006) 39 Cal.4th 826, 857 [in capital case, defense counsel properly waived right to have discussions of juror hardship questionnaires reported] (*Rogers*).) *Turner* explained that since the right to transcription under CCP 269(a)(2) is a statutory right, the only requirement bearing on counsel's waiver of this right is voluntariness, which is satisfied when counsel ""freely

14

1  acquiesce[s]'"'" to the waiver on the record. (*Turner, supra*, at p. 264.)

2  > [Fn.3] See *Ryan v. Commission on Judicial Performance* (1988) 45 Cal.3d
   > 518, 542 [under *Armstrong, supra*, 126 Cal.App.3d 565, a misdemeanor
3  > defendant has the same right, under equal protection principles, as a felony
   > defendant *to request* a verbatim record and court must instruct defendants
4  > *appearing in propria persona* of this right].)

5  It bears iteration that counsel effected only a limited, qualified waiver here.
   Counsel's waiver concerned just the jury selection phase of the trial and counsel
6  reserved the right to request a court reporter at any point during jury selection, for
   example, in the event that counsel lodged an objection, among other scenarios. We
7  conclude there was no error under CCP 269(a)(2) here; nor has [Petitioner] shown
   that his Fourteenth Amendment due process rights were violated. Indeed, because
8  [Petitioner] affirmatively and properly waived the reporting of the jury selection
   proceeding, he may not complain on appeal about the putative inadequacy of the
9  record of that proceeding. (See, e.g., *Rogers, supra*, 39 Cal.4th at p. 857 [defense
   counsel's suggestion in capital case that discussions of juror hardship
10 questionnaires need not be transcribed waived complaint of inadequate record on
   appeal]; *People v. Cummings, supra*, 4 Cal.4th at p. 1333, fn. 70; see also *People*
11 *v. Mickey* (1991) 54 Cal. 3d 612, 667 [failure to object in trial court forfeits claim
   of inadequate appellate record of juror excusals].) [Petitioner]'s claim that he was
12 prejudiced by the lack of transcription is therefore foreclosed and his citations to
   cases addressing prejudice to defendants on account of lost records are, in turn,
13 unavailing.

14 In sum, while we do not endorse a generalized practice of a trial court inviting a
   stipulation to relieve the court reporter from reporting jury selection, or trial
15 counsel [defense counsel or the prosecutor] entering into such a stipulation, we do
   not find error by this trial court and certainly no structural error.

16

17 People v. Hicks, 2019 WL 311916, at *5-7 (Cal. Ct. App. 2019).

18        *a.*    *Legal Standard*

19       The Supreme Court has held that "[t]rial management is the lawyer's province: Counsel

20 provides his or her assistance by making decisions such as 'what arguments to pursue, what

21 evidentiary objections to raise, and what agreements to conclude regarding the admission of

22 evidence.'" McCoy v. Louisiana, 138 S. Ct. 1500, 1508, 200 L. Ed. 2d 821 (2018) (quoting

23 Gonzalez v. United States, 553 U.S. 242, 248 (2008) (internal quotation marks and citations

24 omitted).  "Some decisions, however, are reserved for the client - notably, whether to plead

25 guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal.  McCoy,

26 138 S. Ct. at 1508 (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)).  Notably, the Supreme

27 Court has never held that a state court must obtain a personal waiver of transcription of any part

28 of a criminal proceeding from a criminal defendant.

15

1            *b.        Analysis*

2            Federal habeas relief is barred unless Petitioner can demonstrate that the state court's

3    alleged failure was contrary to, or an unreasonable application of, clearly established federal law

4    as determined by the Supreme Court.  Since there is no clearly established Supreme Court

5    authority requiring a personal waiver of transcription of jury selection, Petitioner's claim is barred

6    under § 2254(d).

7            Petitioner claims that waiving transcription of jury selection is equivalent to waiving his

8    right to appeal any grounds based on that portion of his trial.  Again, the Supreme Court has not

9    so held so, and relief is barred.  Moreover, as noted by the appellate court, the waiver was limited

10   only to jury selection, and counsel reserved the right to request a court reporter at any point

11   during jury selection, should the need arise.  In light of the lack of Supreme Court authority on

12   the issue, a state court could reasonably find that the limited, qualified waiver of transcription of

13   jury selection did not constitute a waiver of Petitioner's right to appeal.  Petitioner retained the

14   right to appeal and in fact exercised that right.

15                   2.        Ineffective Assistance of Counsel – Waiver of Voir Dire Transcription

16           Petitioner alleges that defense counsel's decision to waive reporting of the jury selection

17   was unreasonable and constituted ineffective assistance.  This claim was also presented on direct

18   appeal and denied by the appellate court, as follows:

19           [Petitioner] argues, in the alternative, that counsel was ineffective for having
             waived the reporting of the jury selection proceeding. To establish ineffective
20           assistance of counsel, a defendant must show that counsel's performance "fell
             below an objective standard of reasonableness," and that "there is a reasonable
21           probability that, but for counsel's unprofessional errors, the result of the
             proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S.
22           668, 688, 694; see *People v. Hester* (2000) 22 Cal.4th 290, 296.) Here, the record,
             including the settled statement of the jury selection proceeding, does not suffice
23           for purposes of assessing prejudice arising from counsel's waiver of reporting of
             the jury selection proceeding. [Petitioner] therefore cannot succeed on a claim of
24           ineffective assistance of counsel on appeal and the matter is best addressed in
             habeas corpus proceedings. Although [Petitioner] points to two jurors' potentially
25           disqualifying responses in jury questionnaires contained in the record, as he
             acknowledges, we cannot determine whether these points were addressed and
26           cleared up during voir dire. [Fn.4] In addition, even had the jury selection
             proceedings been transcribed, claims of ineffective assistance of counsel would
27           nonetheless likely have to be litigated in habeas proceedings so as to develop a
             record of counsel's tactical choices and strategy in relation to the composition of
28           the jury. (See, e.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267

                                                          16

(*Mendoza Tello*).)

> [Fn.4] For example, [Petitioner] points to a response by one juror in his juror questionnaire that he would not favor either side "because each has to prove their case." However, the record also shows that the trial judge assured the parties that he would "hit reasonable doubt hard, People's burden of proof" during jury selection proceedings.

> [Petitioner], however, argues that counsel's qualified waiver of reporting of the jury selection proceeding was tantamount to a complete deprivation of counsel at jury selection and for purposes of appeal, requiring per se reversal. This argument is unpersuasive because the authorities [Petitioner] relies on are inapplicable to the situation that appears here. In the cases cited by [Petitioner], the records on appeal or collateral review concretely demonstrated that the respective counsel's performance was deficient to the point that the defendants were denied assistance of counsel altogether. Under the circumstances that apply here, any claim that counsel's performance amounted to a denial of counsel would have to be addressed in habeas proceedings.

Hicks, 2019 WL 311916, at 7-8.

>          a.       *Legal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

1    With the passage of the AEDPA, habeas relief may only be granted if the state-court

2 decision unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.

3 <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

4 federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect

5 but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v.</u>

6 <u>Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard

7 is "doubly deferential" because it requires that it be shown not only that the state court

8 determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

9 <u>Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a

10 state court has even more latitude to reasonably determine that a defendant has not satisfied that

11 standard.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

12 application was unreasonable requires considering the rule's specificity.  The more general the

13 rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

14    *b.    Analysis*

15    In assessing the claim, the state court correctly applied the <u>Strickland</u> standard. Therefore,

16 the only question before the Court is whether that determination was reasonable.

17    As noted by the appellate court, Petitioner admitted that he could not demonstrate

18 prejudice without voir dire transcripts.  He only speculates as to the prejudicial effect.  This is

19 fatal to the claim.  <u>Strickland</u>, 466 U.S. at 694.  Moreover, the state court reasonably dispensed

20 with Petitioner's claim of presumed prejudice because counsel was not absent or constructively

21 absent.  <u>See Wright v. Van Patten</u>, 552 U.S. 120, 124-125 (2008) (quoting <u>United States v.</u>

22 <u>Cronic</u>, 466 U.S. 648, 659 (1984) (presumption of prejudice may be appropriate where there is a

23 "'complete denial of counsel,' that is, when 'counsel [is] either totally absent, or prevented from

24 assisting the accused during a critical stage of the proceeding.'")

25    Petitioner fails to demonstrate prejudice, or presumed prejudice, from counsel's alleged

26 error.  He fails to show that the state court rejection of his claim was contrary to, or an

27 unreasonable application of, Supreme Court authority. The claim should be rejected.

28

18

3.      Ineffective Assistance of Counsel – Failure to Request Instruction

Petitioner next alleges counsel was ineffective in failing to request a pinpoint instruction

on heat of passion provocation.  Petitioner alleges that if the jury believed his testimony that he

killed the victim in a panic after the victim cornered him and came after him with a hatchet, he

would have been found guilty of second degree heat of passion murder rather than first degree

murder.  Petitioner raised this claim on direct appeal.  In the last reasoned decision, the Fifth

DCA denied the claim, as follows:

> First degree murder is reduced to second degree murder when premeditation and
> deliberation are negated by heat of passion arising from provocation. (*People v.
> Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) Unlike the objective heat of
> passion inquiry in the context of voluntary manslaughter, the test of provocation
> sufficient to preclude deliberation and premeditation is entirely subjective. "If the
> provocation would not cause an average person to experience deadly passion but it
> precludes the defendant from subjectively deliberating or premeditating, the crime
> is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327,
> 1332 (*Hernandez*).) More specifically, the test is whether "the defendant's decision
> to kill was a direct and immediate response to the provocation such that the
> defendant acted without premeditation and deliberation." (*People v. Fenenbock*
> (1996) 46 Cal.App.4th 1688, 1705, citing *People v. Wickersham* (1982) 32 Cal.3d
> 307, 329.) [Fn.5] Thus, the provocation sufficient to mitigate first degree murder
> to second degree murder requires only a finding that the defendant's subjective
> mental state was such that he did not deliberate and premeditate before deciding to
> kill. (*Fitzpatrick, supra*, at pp. 1295-1296.)
>
> > [Fn.5] *Wickersham* was overruled on another ground by *People v. Barton*
> > (1995) 12 Cal.4th 186, 201.
>
> [Petitioner] argues that defense counsel was ineffective for failing to request the
> trial court to instruct the jury pursuant to CALCRIM No. 522, the pattern
> instruction on the subjective provocation defense to premeditated and deliberated
> first-degree murder. CALCRIM No. 522 provides: "Provocation may reduce a
> murder from first degree to second degree.... The weight and significance of the
> provocation, if any, are for you to decide. [¶] If you conclude that the defendant
> committed murder but was provoked, consider the provocation in deciding
> whether the crime was first or second degree murder."
>
> CALCRIM No. 522 is a pinpoint instruction. Accordingly, the trial court is not
> required to sua sponte instruct the jury under CALCRIM No. 522; rather, the court
> must instruct pursuant to CALCRIM No. 522 upon defense request, when there is
> substantial evidence to support the instruction. (See *People v. Wilkins* (2013) 56
> Cal.4th 333, 348-349, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119
> ["Pinpoint instructions 'relate particular facts to a legal issue in the case or
> "pinpoint" the crux of a defendant's case'" and must be given on request "'when
> there is evidence supportive of the theory.'"]; *People v. Rogers* (2006) 39 Cal.4th
> 826, 878 (*Rogers*) ["Because CALJIC No. 8.73 [the CALJIC analog of CALCRIM No. 522] relates the evidence of provocation to the specific
> legal issue of premeditation and deliberation, it is a 'pinpoint instruction.'"];
> *People v. Mayfield* (1997) 14 Cal.4th 668, 778 [CALJIC No. 8.73 is a pinpoint

instruction because it "relates particular facts to an element of the charged crime and thereby explains or highlights a defense theory"], disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732-1734 [CALJIC No. 8.73 is a pinpoint instruction because it relates certain evidence to element of offense so as to raise reasonable doubt as to that element]; *People v. Middleton* (1997) 52 Cal.App.4th 19, 30-33 [CALJIC No. 8.73 is pinpoint instruction to be given on request], disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3.)

Contradicting his police statement, [Petitioner] testified at trial that he shot Desalles when Desalles came at him with a hatchet and refused to put it down even when [Petitioner] told him, at gunpoint, to do so. In light of [Petitioner]'s testimony, defense counsel requested an instruction on imperfect self-defense, which the court denied. [Petitioner] acknowledges that the court correctly denied counsel's request for an instruction on imperfect self-defense because imperfect self-defense is inapplicable when the victim is legally justified in resorting to self-defense against the defendant, as a result of the defendant's own conduct. (See *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179.)

Although counsel requested an instruction on imperfect self-defense, he did not request one on subjective provocation, i.e., CALCRIM No. 522. As stated above, [Petitioner] argues counsel was ineffective on account of this failure. He argues:

> "[Petitioner's] testimony, if believed, established that he did not act with premeditation or by lying in wait. And the reason he did not act with premeditation or by lying in wait was because of perceived provocation which put him in fear and caused him to act rashly. That is the very situation which the heat of passion second degree murder doctrine covers."

Here the jury was instructed on a "deliberation and premeditation" theory of first degree murder. In connection with this theory, it was told that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.) Further, as an alternative to the "deliberation and premeditation" theory of first degree murder, the jury was instructed on the lying in wait theory of first degree murder. [Fn.6] (*People v. Stanley* (1995) 10 Cal.4th 764, 794 ["To prove first degree murder of any kind, the prosecution must first establish a murder within section 187—that is, an unlawful killing with malice aforethought. [Citations.] Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait."].) The jury found [Petitioner] guilty of first degree murder.

[Fn.6] Specifically, the trial court stated:

> "The defendant has been prosecuted for first degree murder under two theories: (1) 'the murder was willful, deliberate, and premeditated' and (2) 'the murder was committed by lying in wait.' [¶] Each theory of first degree murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with

20

premeditation.... [¶] ... [¶]

"The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if:

"1. He concealed his purpose from the person killed;
"2. He waited and watched for an opportunity to act; [¶] AND [¶]
"3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation and premeditation."

The jury was also instructed on the special circumstance of "murder committed by means of lying in wait." (CALCRIM No. 728.) The jury returned a true finding on the special circumstance allegation of murder by means of lying in wait. "'The lying-in wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage."' (*People v. Moon* (2005) 37 Cal.4th 1, 22; *People v. Wright* (2015) 242 Cal.App.4th 1461, 1496 (*Wright*) ["'[L]ying in wait "[is] the functional equivalent of proof of premeditation, deliberation, and intent to kill."'"].) The jury would thus necessarily also have found [Petitioner] guilty of murder by lying in wait, which is first degree murder. (See *Wright, supra*, at p. 1496.)

Significantly, provocation is irrelevant to first degree murder by means of lying in wait. (*People v. Battle* (2011) 198 Cal.App.4th 50, 75 ["if the jury found murder by lying in wait, provocation was irrelevant because the murder could not be reduced to second degree murder"].) Accordingly, the failure to instruct the jury on subjective provocation pursuant to CALCRIM No. 522 is generally harmless when, as here, the jury found true a lying in wait special circumstance. (See *Wright, supra*, 242 Cal.App.4th at pp. 1496-1497 [error in failing to give instruction on provocation, as basis for reduction of murder from first to second degree, was harmless based on true finding as to lying in wait special circumstance]; also see *People v. Cruz* (2008) 44 Cal.4th 636, 665 (*Cruz*) [a lying in wait special circumstance finding renders the failure to instruct on provocation/heat of passion manslaughter harmless error].) Under the facts of this case, we conclude that counsel's failure to request an instruction on subjective provocation, i.e., CALCRIM No. 522, was harmless under any standard of prejudice, in light of the jury's true finding on the lying in wait special circumstance. Accordingly, [Petitioner]'s claim that counsel was ineffective for failing to request such an instruction fails.

[Petitioner], however, contends that the foregoing authorities do not foreclose his claim of ineffective assistance of counsel, because counsel's failure to request CALCRIM No. 522 must be evaluated in light of his further failure to present evidence of [Petitioner]'s good character from his friends and family. Based on character letters from friends and family that counsel submitted on [Petitioner]'s behalf at sentencing, [Petitioner] argues that counsel was ineffective in failing to call the people who wrote the letters as trial witnesses. He asserts character evidence from these witnesses would have resulted in a better outcome for him

1   with respect to the jury's true finding on the lying in wait special circumstance.
    [Petitioner] suggests that counsel's failure to present character evidence and his
2   failure to request CALCRIM No. 522, *taken together*, prejudiced his defense.
    However, regarding the existence of good character evidence, [Petitioner] points
3   only to the letters submitted on his behalf at sentencing, nothing more. This
    minimal record is entirely inadequate to assess whether counsel should have called
4   the people who wrote these letters as trial witnesses, and to evaluate the
    consequences of opening the door for the prosecution to present potentially bad
5   character evidence concerning [Petitioner]. (See *Mendoza Tello, supra*, 15 Cal.4th
    at p. 267 [an appellate court should not "brand a defense attorney incompetent
6   unless it can be truly confident all the relevant facts have been developed"].)
    Accordingly, we reject [Petitioner]'s contention that counsel was ineffective in
7   failing to present character evidence, and in turn, in failing to request CALCRIM
    No. 522.

8

9   Hicks, 2019 WL 311916, at *8-10.

10          a.      *Legal Standard and Analysis*

11          As previously stated, claims of ineffective assistance of counsel are reviewed according to

12   Strickland's two-pronged test.  Strickland, 466 U.S. at 687-88.  Petitioner must establish that

13   counsel's deficient performance fell below an objective standard of reasonableness under

14   prevailing professional norms, and that he suffered prejudice in that there was a reasonable

15   probability that, but for counsel's unprofessional errors, he would have prevailed. Id. at 687-88,

16   694.

17          Petitioner claims counsel was ineffective for failing to request that the trial court instruct

18   the jury with the pinpoint instruction, CALJIC No. 522, on subjective provocation defense.

19   Petitioner claims that if the jury believed his testimony that he only shot the victim when the

20   victim came at him with a hatchet, this would have established that he did not act with

21   premeditation or by lying in wait.  Petitioner's arguments are not persuasive.

22          The state court noted that under state law, provocation is irrelevant to first degree murder

23   by means of lying in wait.  A state court determination on state law is binding on a federal court

24   sitting in habeas.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam).  The jury found true

25   the special allegation that the murder was committed by means of lying in wait.  As noted by the

26   appellate court, since the jury found the special circumstance true, it would necessarily also have

27   found Petitioner guilty of murder by lying in wait, which constitutes first degree murder.  Thus,

28   the alleged failure to instruct on subjective provocation was harmless, and Petitioner cannot

1    demonstrate prejudice resulting from defense counsel's alleged failure.

2           Petitioner further contends that counsel should have presented character witnesses to show

3    he was not the type of person to lie in wait.  However, the state court reasonably determined that

4    the claim was speculative, because the minimal record he proffered was entirely inadequate to

5    assess whether counsel should have called the witnesses.  This would have also opened the door

6    for the prosecutor to submit evidence of Petitioner's bad character.  Because of this, the state

7    court could not find that counsel erred or that the error was prejudicial, as doing so would have

8    been completely speculative.  Petitioner fails to establish that no fairminded jurist would agree

9    with the state court decision.  The claim should be denied.

10                        4.      Cumulative Prejudice

11          Petitioner contends that the above errors, taken together, deprived him of his right to due

12   process.  This claim was raised on direct review in the state court.  The appellate court rendered

13   the last reasoned decision, as follows:

14          [Petitioner] contends there was cumulative error. A series of errors, though
            independently harmless, may in some circumstances rise to the level of reversible
15          and prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People
            v. Hill* (1998) 17 Cal.4th 800, 844.) That is not the case here as there are either no
16          errors or any error was not prejudicial.

17   Hicks, 2019 WL 311916, at *10.

18          "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if

19   their cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir.

20   1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon,

21   283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth Circuit has also recognized that where

22   there is no single constitutional error, nothing can accumulate to the level of a constitutional

23   violation.  See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  In this case, no errors occurred,

24   and hence, there can be no cumulative error.  Even if errors occurred, a reasonable factfinder

25   could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

26                        5.      Cruel and Unusual Punishment

27          Petitioner states that he was a relatively youthful 21 year old when he committed the

28   crime.  He contends that the mandatory sentence of life without possibility of parole ("LWOP")

                                                    23

1   pursuant to Cal. Penal Code § 190.2(a) constitutes cruel and unusual punishment in violation of

2   the Eighth Amendment, because the sentencing court was deprived of the opportunity to exercise

3   discretion to consider his youth and impose a sentence less than LWOP.  Petitioner raised this

4   claim on direct appeal to the state courts.  The Fifth DCA rejected the claim in the last reasoned

5   decision, as follows:

> Section 190.2, subdivision (a) prescribes a mandatory LWOP sentence for any
> defendant convicted of special circumstance murder. [Petitioner], who was 21
> years old when he murdered Desalles, was sentenced to LWOP under this section.
> He now argues that "section 190.2, subdivision (a) violates the Eighth
> Amendment's prohibition on cruel and unusual punishment insofar as it deprives
> the sentencing court of the discretion to consider a young adult defendant's youth
> and immaturity, and to impose a sentence less than LWOP."
>
> [Petitioner] essentially argues that, given his relatively youthful age at the time of
> commission of the murder, the rationale of *Miller v. Alabama* (2012) 132 S.Ct.
> 2455, 2460 (*Miller*), should apply to his case. In *Miller*, the United States Supreme
> Court held that the "Eighth Amendment forbids a sentencing scheme that
> mandates life in prison without possibility of parole for juvenile offenders." (*Id.* at
> p. 2469.) More specifically, *Miller* held that "mandatory life without parole for
> those under the age of 18 at the time of their crimes violates the Eighth
> Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller, supra*, at
> p. 2460.) In reaching its holding, *Miller* relied "extensively on differences between
> juveniles and adults with regard to their culpability and capacity for change."
> (*People v. Gutierrez* (2004) 58 Cal.4th 1354, 1360.) *Miller* explained that the
> "distinctive attributes of youth diminish the penological justifications for imposing
> the harshest sentences on juvenile offenders, even when they commit terrible
> crimes." (*Miller, supra*, at p. 2465.) *Miller* did not foreclose LWOP sentences for
> juveniles in homicide cases but held that before a minor could be so sentenced, the
> sentencing judge or jury was required to have an opportunity to consider the
> mitigating qualities of youth, in particular, "how children are different, and how
> those differences counsel against irrevocably sentencing them to a lifetime in
> prison." (*Id*. at p. 2469.)
>
> *Miller's* prohibition on mandatory life without parole sentences under the Eighth
> Amendment is limited to defendants who were under the age of 18 when their
> crimes were committed, since that is the point where society draws the line
> between childhood and adulthood for many purposes. (See *People v. Argeta*
> (2012) 210 Cal.App.4th 1478, 1482.) In *People v. Caballero* (2012) 55 Cal.4th
> 262, 268, the California Supreme Court concluded that, under a line of United
> States Supreme Court cases culminating in *Miller*, "sentencing a juvenile offender
> for a nonhomicide offense to a term of years with a parole eligibility date that falls
> outside the juvenile offender's natural life expectancy constitutes cruel and unusual
> punishment in violation of the Eighth Amendment." Thus, the highest courts of the
> country and the state have drawn the line at 18 years of age, with respect to
> consideration of the special characteristics of youthfulness for sentencing
> purposes, in the context of the Eighth Amendment. We, in turn, are bound by these
> holdings. (See *People v. Perez* (2016) 3 Cal.App.5th 612, 617.) Accordingly, we
> reject [Petitioner]'s argument that section 190.2, subdivision (a) violates the Eighth
> Amendment's prohibition on cruel and unusual punishment because it precludes
> consideration of the relative youthfulness of defendants like [Petitioner], who were

1  in their early twenties when the relevant crime was committed.

2  Hicks, 2019 WL 311916, at *10–11.

3         *a.*        *Legal Standard and Analysis*

4        The U.S. Supreme Court has issued three significant cases concerning the Eighth

5  Amendment's prohibition on cruel and unusual punishment as it applies to juvenile offenders.  In

6  Roper v. Simmons, 543 U.S. 551, 578 (2005), the Supreme Court held that the Eighth

7  Amendment forbids the "imposition of the death penalty on offenders who were under the age of

8  18 when their crimes were committed."  In Graham v. Florida, 560 U.S. 48, 82 (2010), the

9  Supreme Court held that the Eighth Amendment "prohibits the imposition of a life without parole

10  sentence on a juvenile offender who did not commit homicide."  In Miller v. Alabama, 567 U.S.

11  460, 465 (2012), the Supreme Court held that "mandatory life without parole [sentences] for

12  those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition

13  on 'cruel and unusual punishments.'" Nothing in Miller, Graham, or Roper precludes an LWOP

14  sentence for an adult offender, even a young adult offender who is 18.

15        In Roper, the Supreme Court recognized that a line had to be drawn for the special

16  sentencing rules for young offenders, and chose to draw the line at age 18:

17        Drawing the line at 18 years of age is subject, of course, to the objections always
raised against categorical rules. The qualities that distinguish juveniles from adults

18  do not disappear when an individual turns 18. By the same token, some under 18
have already attained a level of maturity some adults will never reach. For the

19  reasons we have discussed, however, a line must be drawn. The plurality opinion
in *Thompson[ v. Oklahoma*, 487 U.S. 815 (1988) ] drew the line at 16. In the

20  intervening years the *Thompson* plurality's conclusion that offenders under 16 may
not be executed has not been challenged. The logic of *Thompson* extends to those

21  who are under 18. The age of 18 is the point where society draws the line for many
purposes between childhood and adulthood. It is, we conclude, the age at which

22  the line for death eligibility ought to rest.

23  Roper, 543 U.S. at 574.  Neither Graham nor Miller disturbed that dividing line. The Supreme

24  Court cases thus mandate special consideration only for juvenile offenders (i.e., those offenders

25  who committed their offenses while under age 18), and do not mandate special consideration of

26  offenders who committed their offenses at age 18 or later.  California has drawn a distinction

27  between those under 18 and those over 18 with respect to the most serious crimes for which an

28  LWOP sentence would be imposed, and no Supreme Court case prohibits such line drawing.

Because Petitioner was not a juvenile at the time he committed murder, the holdings of <u>Roper</u>, <u>Graham</u> and <u>Miller</u> establishing a constitutional limit on sentencing do not apply to him, and he has no constitutional right to youthful consideration for sentencing purposes.  The state court rejection of the claim was not contrary to, or an unreasonable application of, Supreme Court authority.  The claim should be denied.

## IV.    RECOMMENDATION

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  __April 12, 2022__                                    _/s/ Sheila K. Oberto_
                                                    UNITED STATES MAGISTRATE JUDGE